# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | |
|---|---|
| **BLACK WARRIOR RIVERKEEPER, INC.** ) ) ) ) | |
| Plaintiff, ) ) | Case No. **7:22-cv-01178-LSC** |
| v. ) ) | |
| **WARRIOR MET COAL, MINING, LLC,** ) ) ) | |
| Defendant. | |

## SETTLEMENT AGREEMENT AND CONSENT DECREE

This matter is now before the Court at the request of all parties for the approval and entry of a consent decree representing settlement of all claims alleged in the Complaint (Doc. 1) by plaintiff Black Warrior Riverkeeper, Inc. (Riverkeeper) against defendant Warrior Met Coal Mining, LLC (WMC).

The Court, having reviewed the terms set out herein, finds the settlement terms appropriate and reasonable and in the public's best interest and hereby approves those terms as stated herein.

**NOW, THEREFORE,** with the consent of the Parties, **IT IS HEREBY ADJUDGED, ORDERED,** and **DECREED** as follows:

## I. INTRODUCTION

Riverkeeper filed this action under the federal Clean Water Act (CWA) § 505, 33 U.S.C.§ 1365, under the federal Surface Mining Control and Reclamation Act (SMCRA) § 520, 30 U.S.C. § 1270, and under the Alabama Surface Mining Control and Reclamation Act (ASMCRA), Ala. Code § 9-16-95. Riverkeeper seeks declaratory relief, injunctive relief, penalties, and costs of litigation (including reasonable attorney and expert witness fees) arising out of WMC's alleged unpermitted discharges from Slurry Impoundment No. 14 at WMC's Mine No. 7 and associated Preparation Plant (Mine), which is subject to National Pollutant Discharge Elimination System (NPDES) Permit No. AL0029181 (Permit) issued by the Alabama Department of Environmental Management (ADEM).

Riverkeeper alleges that WMC, as the owner and operator of the Mine and Slurry Impoundment No. 14, is in violation of sections 301 and 402 of the CWA (33 U.S.C. §§ 1311 and 1342), and of administrative rules and/or regulations of the Alabama Surface Mining Commission (ASMC) promulgated pursuant to § 503 of SMCRA (30 U.S.C. § 1253), and ASMCRA (Ala. Code § 9-16-90)—specifically, Ala. Admin. Code r. 880-X-10C-.12 (4)(a) ("surface-water quality shall be protected by handling earth materials, ground-water discharges, and runoff in a manner that . . . prevents, to the extent possible using the best technology currently available, additional contribution of suspended solids to streamflow outside the permit area;

and otherwise prevents water pollution"); Ala. Admin. Code r. 880-X-10C-.18 ("[d]ischarges from sedimentation ponds, permanent and temporary impoundments, coal processing waste, dams and embankments, and diversions shall be controlled, by energy dissipaters, riprap channels, and other devices, where necessary, to reduce erosion, to prevent deepening or enlargement of stream channels, and to minimize disturbance of the hydrologic balance"); and Ala. Admin. Code r. 880-X-10C-.49 (1) ("the operator shall, to the extent possible using the best technology currently available, minimize disturbances and adverse impacts on fish, wildlife, and related environmental values and shall achieve enhancement of such resources where practicable").

WMC filed an Answer (Doc. 19) denying Riverkeeper's allegations as set forth in the Complaint (Doc. 1).

## II.   JURISDICTION AND VENUE

The Court has jurisdiction over this matter and of Riverkeeper's claims pursuant to 28 U.S.C. § 1311, 33 U.S.C. § 1365(a), 30 U.S.C. § 1270(a), and 28 U.S.C. § 1367(a). Venue is appropriate in the Northern District of Alabama because the Mine, the source of the alleged violations, is located within the Northern District of Alabama. *See* CWA § 505(c)(1), 33 U.S.C. § 1365(c)(1), and SMCRA § 520(c)(1), 30 U.S.C. § 1270(c)(1).

### III.   EFFECT OF SETTLEMENT

In exchange for WMC's agreement to and compliance with the terms of this settlement of a contested matter, Riverkeeper hereby releases and forever discharges WMC and its members; any parents, subsidiaries, and affiliates, including officers, directors, and shareholders; and any partners, attorneys, predecessors, successors, representatives, insurers, assignees, agents, employees, executors, administrators, heirs, and all persons acting by, through, or in any way on behalf of WMC of and from any and all claims alleged by Riverkeeper in the Complaint (Doc. 1), as well as any similar claims that may have occurred prior to the Effective Date (as defined herein) of this Agreement. The Settlement Agreement and Consent Decree (Consent Decree) shall become effective upon its entry following any required time period for notification and consideration by the United States (the "Effective Date").

### IV.   APPLICABILITY

A.   The provisions of this Consent Decree apply to and are binding on Riverkeeper and WMC and their successors and/or assigns.

B.   No transfer of ownership of Mine No. 7 shall relieve WMC of its obligations to ensure that the terms of this Consent Decree are implemented.

### V.   INJUNCTIVE RELIEF

WMC's March 2023 Immediate Action Plan for Slurry Impoundment No. 14 – Embankment A (WMC-001450-74) (IAP) acknowledges a "groundwater spring

or seep" located to the southwest of the Embankment A facility located above the Beaver Pond (herein referred to as the "overland seeps"). "Overland seeps" are seeps from Slurry Impoundment No. 14 in communication with fine refuse material from the Mine that are discharging to the surface and flowing over land or into drainages above the Beaver Pond that flow into waterbodies, such as the Beaver Pond, Tributary 1, and Tributary 2 (as described in the Complaint) but does not include any naturally occurring groundwater seeps or springs that are discharged through Outfall 042 under the Permit. The overland seep or seeps identified in the IAP exhibited "inconsistent behavior and qualities" such that WMC submitted the IAP to prevent the potential communication of fine refuse material from the Mine "through uncompacted mine spoil in the pond which was left between Stage 4 and Stage 6 of Embankment A along the southern extents of Slurry Impoundment No. 14."

On July 6, 2023, ADEM approved a permit modification of NPDES Permit No. AL0029181 to add proposed Outfall 042. Outfall 042 is located on Tributary 1, downstream of the Beaver Pond and upstream of Tributary 2. The NPDES permit boundary area now includes the watershed area surrounding the Beaver Pond, as described in WMC's permit modification application (the "Beaver Pond area"). The NPDES permit now also includes discharge limitations and monitoring requirements for Outfall 042. The NPDES permit also requires WMC to implement Best

5

Management Practices (BMPs) at Outfall 042. These BMPs include the obligation to "minimize the contact of water with overburden," and to route all surface drainage and stormwater runoff containing any pollutants or wastes for discharge through a permitted discharge point, including Outfall 042.

WMC agrees to the following terms:

A.   WMC shall perform a technical analysis of the remedy proposed by the IAP and include any necessary data or analysis that supports the selection of that remedy. The general technical basis WMC uses to support the IAP is summarized by the following statement in the IAP:

> *The plan for sealing off the potential communication is to fill the depression area between the downstream face of Stage IV Embankment A and the upstream face of Stage VI Embankment A with coarse refuse material. This area between Stage 4 and Stage 6 is the only portion of the Slurry Impoundment No.14 Embankment A area which does not have a layer of compacted material separating the fine refuse and unconsolidated mine spoil, and the action of backfilling this area is currently viewed as the best practical solution to safely and permanently prevent possible communication between the fine refuse and unconsolidated mine spoil material.*

B.   WMC has or will provide to Riverkeeper the following information to verify that the remedy specified by the IAP and described above will effectively mitigate the communication of fine refuse material via the overland seeps from Slurry Impoundment No. 14 to the Beaver Pond, Tributary 1, and Tributary 2:

(1) information pertaining to the construction of Slurry Impoundment No. 14, (such as impoundment construction and the material and construction

6

specifications implemented) which supports WMC's judgment that the remedy proposed by the IAP will be effective;

(2) any analysis that indicates that the "depression area" identified by WMC in the IAP is a potential source of the preferential seepage;

(3) definitions of "coarse refuse material," "fine refuse", and unconsolidated mine waste," including their description and particle size distribution; their geotechnical properties; the origin of the materials; the distribution and density of the materials; and the hydraulic conductivity of the materials;

(4) a definition or explanation of "compacted materials;"

(5) whether WMC will use geotextile fabric to act as a filter and bentonite to help develop a seepage barrier as part of the IAP, as the May 7, 2021 Immediate Action Plan did for the blackwater spills released from the area near Embankment B;

(6) the basis for the statement that the "area between Stage 4 and Stage 6 is the only portion of the Slurry Impoundment No. 14 Embankment A area which does not have a layer of compacted material;"

C. Riverkeeper will provide written confirmation to WMC that all information described under subsection B above has been provided to Riverkeeper.

D. Unless otherwise specified, for a period of two (2) years after the implementation of the IAP, WMC will perform quarterly sampling and collect data that will help

evaluate the success of the IAP at (a) preventing the potential communication of fine refuse material from the Mine through uncompacted mine spoil along Embankment A in Slurry Impoundment No. 14 and (b) mitigating the overland seeps. That data will be shared with Riverkeeper on a quarterly basis.

(1) WMC agrees to implement the following water sampling plan based on Section I.A.1(e) of the Permit:

| Parameter | Discharge Limitations | | | Monitoring Requirements | |
|---|---|---|---|---|---|
| | Daily Minimum | Monthly Average | Daily Maximum | Sample Type | Measurement Frequency[24] |
| Specific Conductance 00095 | ------- | Report µS/cm | Report µS/cm | Grab | 2/Month |
| Sulfate (As S) 00154 | ------- | Report mg/L | Report mg/L | Grab | 2/Month |
| pH 00400 | 6.0 s.u. | ------- | 8.5 s.u. | Grab | 2/Month |
| pH[25] 00400 | 6.0 s.u. | ------- | 10.5 s.u. | Grab | 2/Month |
| Solids, Total Suspended 00530 | ------- | 35.0 mg/L | 70.0 mg/L | Grab | 2/Month |
| Iron, Total (As Fe) 01045 | ------- | 3.0 mg/L | 6.0 mg/L | Grab | 2/Month |
| Manganese, Total (As Mn)[26] 01055 | ------- | 2.0 mg/L | 4.0 mg/L | Grab | 2/Month |
| Nickel, Dissolved (As Ni) 01065 | ------- | 28.9 µg/L | 260.5 µg/L | Grab | 1/Month |
| Selenium, Total (As Se) 01147 | ------- | 5.0 µg/L | 20.0 µg/L | Grab | 1/Month |
| Flow, In Conduit or Thru Treatment Plant[27] 50050 | ------- | Report MGD | Report MGD | Instantaneous | 2/Month |
| Toxicity, Ceriodaphnia Acute[28] 61425 | ------- | ------- | 0 pass(0)/fail(1) | Grab | 1/Quarter |
| Toxicity, Ceriodaphnia Chronic[29] 61426 | ------- | ------- | 0 pass(0)/fail(1) | Grab | 1/Quarter |
| Toxicity, Pimephales Acute[28] 61427 | ------- | ------- | 0 pass(0)/fail(1) | Grab | 1/Quarter |
| Toxicity, Pimephales Chronic[29] 61428 | ------- | ------- | 0 pass(0)/fail(1) | Grab | 1/Quarter |
| Solids, Total Dissolved (TDS) 70296 | ------- | Report mg/L | Report mg/L | Grab | 1/Quarter |

(2) On a quarterly basis, when there is flow, WMC will sample (a) the two channelized seeps identified by Riverkeeper in the Complaint;[1] (b) in pond at Slurry Impoundment No. 14.; and (c) at NPDES outfall 042.[2] In addition to sampling for the parameters set out in Section I.A.1(e) of the Permit above, WMC will sample for the following additional parameters: calcium, magnesium, sodium, potassium, chlorine, nitrate, volatile organic compounds (VOCs) and semi-volatile organic compounds (SVOCs).[3] Sample collection, handling, preservation and storage must be in accordance with the relevant sections of EPA Region 4's protocols for surface water sampling.[4] The additional monitoring is intended to track surface water quality through the treatment system and to better understand water chemistry over time.

---

[1] Channelized Seep 1 (33.2842965, -87.2405538) and Channelized Seep 2 (33.2842971, -87.2404257). *See* Doc. 1 at 16, ¶¶ 38-39.

[2] WMC does not have to measure and report flow for any samples taken at the seeps or in Slurry Impoundment No. 14. WMC must specifically perform WET testing at NPDES outfall 042 as stated in the Permit and may not rely upon representative sampling from another outfall. WET testing is not required at any other location.

[3] WMC shall sample for at least the same VOCs and SVOCs sampled by Riverkeeper. *See* Doc. 1-3 (Exh. 4) at 2-7.

[4] Found at https://www.epa.gov/sites/default/files/2017-7/documents/surface_water_sampling201_af.r4.pdf

(3) WMC will collect the following additional data once per month for the first six (6) months after the implementation of the IAP, then quarterly for eighteen months, when there is any measurable flow of wastewater into Slurry Impoundment 14. "Wastewater" shall include any inputs into Slurry Pond No. 14, whether they are from pumping, coal washing or preparation, or any other mining activities. The additional data shall include (a) an estimate of impoundment water volume at the time the data is collected; (b) modeled influent flow as measured by an ultrasonic meter that wraps around the outside of the influent pipeline(s) into Slurry Impoundment No. 14, with an external density meter to measure the proportion of solids in the slurry and wastewater; (b) estimates of precipitation gain and evaporation loss, using a portable weather station at the mine or data collected by the nearest government-operated weather station; (c) and measured effluent flows based on monitoring the clarified water that is intermittently pumped out of Slurry Impoundment No. 14 for use at other locations around the mine site or discharged via an NPDES-permitted outfall. This data may be used to evaluate the effectiveness of the IAP.

E. Upon completion of the IAP and activation of Outfall 042, WMC shall cease any discharges not permitted by NPDES Permit No. AL0029181.

F.	If the implementation of the IAP fails to effectively mitigate the overland seep discharges, WMC shall, within one (1) year of the Effective Date submit new plans to the responsible regulatory agencies requesting approval to implement additional measures to mitigate such communication not permitted by NPDES No. AL0029181.

G.	If WMC fails to comply with the discharge limitations or BMPs for Outfall 042 under NPDES Permit No. AL0029181 by January 1, 2025, for each day following January 1, 2025, WMC will incur a time extension payment in the amount of $500 per day for which permit compliance is not achieved, to be paid quarterly to the SEP recipient in Section V.

H.	WMC will confirm it has incorporated an emergency overflow spillway into the design and construction of Slurry Impoundment No. 14 that has sufficient capacity to convey outflows generated by the 1,000-year, 24-hour rainfall event, which is considered appropriate for a dam classified as High Risk/Hazard.

I.	As long as there is a dammed impoundment in the area of Slurry Impoundment No. 14, WMC shall elect to bring Slurry Impoundment No. 14 (or its successor impoundment) under the Alabama Dam Safety Program (Program), Ala. Act No. 2023-414,[5] that will be administered by the Tuscaloosa County Emergency Management Agency (TEMA). Under the Program, WMC shall:

---

[5] https://arc-sos.state.al.us/cgi/actdetail.mbr/detail?year=2023&act=%20414&page=bill.

11

(1) ensure Slurry Impoundment No. 14 is inspected and re-evaluated a minimum of once every two years by an independent third-party Professional Engineer who shall file with TEMA a record of the inspection and re-evaluation. Any "independent third-party Professional Engineer" will be a qualified, professional engineer licensed in Alabama that is not an employee of WMC;

(2) notify TEMA in writing of any construction at, or the enlargement of, Slurry Impoundment No. 14. Any plans and specifications signed and sealed by the design engineer must accompany the notification;

(3) develop and file with TEMA an Emergency Action Plan (EAP) prepared by an engineer in consultation with TEMA, which shall be implemented in the event of an emergency involving Slurry Impoundment No. 14. WMC must test and update this emergency action plan annually. The EAP must include all of the following elements:

(a) Emergency Notification Plan with flowchart;

(b) Statement of purpose;

(c) Project description;

(d) Emergency detection, evaluation, and classification;

(e) General responsibilities;

(f) Preparedness;

(g) Inundation maps or other acceptable description of the inundated area;

(h) Any appendices.

(4) In addition to complying with the Program, WMC shall conduct an inspection of Slurry Impoundment No. 14 every quarter. This inspection may be conducted by WMC, or WMC may hire someone to do the inspection on its behalf. This inspection is not required to be conducted by an engineer. This inspection may be conducted in conjunction with any required MSHA inspection and is not intended to be duplicative of those efforts. Calendar quarters are January 1 through March 31, April 1 through June 30, July 1 through September 30, and October 1 through December 31. The inspection shall verify (with any necessary support, which may include, but not be limited to, test results, data or photographs) whether or not any overland seep discharges or seepage on the downstream slopes of the impoundment present a situation indicative of potential dam failure. The inspection will drive the implementation of any appropriate steps to stop any identified overland seep discharges or seepages that present a situation indicative of potential dam failure. WMC shall immediately notify TEMA, the ASMC, and MSHA when symptoms of failure are identified, which may include but are not limited to, erosion, surface cracks, overland seep discharges, seepage, settlement, or movement.

       WMC shall keep records of the quarterly inspections and notifications, and shall furnish copies of all inspection reports and all notifications to Riverkeeper. WMC's obligation to furnish these reports terminates two (2) years from the Effective Date.

J.    Prior to the transfer of ownership or operation of the Mine, Slurry Impoundment No. 14, the Prep Plant or any other associated operations or facilities, WMC must notify any subsequent owner/operator of the obligations of the Consent Order and require that any subsequent owner/operator participate in the Program and be bound by the terms of the Consent Order.

## VI.   SUPPLEMENTAL ENVIRONMENTAL PROJECT

In consideration of the settlement of Riverkeeper's claims and the releases contained in this Consent Decree, WMC shall pay the sum of Two Hundred And Fifty Thousand Dollars ($250,000) for the establishment of a Supplemental Environmental Project (SEP) in the Davis Creek subwatershed of the Black Warrior River. Said sum shall be paid in one lump sum payment. WMC shall remit this payment to the Freshwater Land Trust at the following address:

Freshwater Land Trust<br>
3501 1st Ave S<br>
Birmingham, Alabama 35222

WMC shall pay this amount within thirty (30) days of the Effective Date of this Consent Decree. WMC shall notify Riverkeeper of the payment by sending a copy

of the documents evidencing the payment to Riverkeeper at the time the payment is made, and WMC will also file a notice of such payment with the Court. Nothing in this Agreement will preclude WMC from promoting, publicizing, or otherwise taking credit for any such payment made to the Freshwater Land Trust for environmental, social, and governance purposes.

## VII.  COSTS

WMC will pay Twenty-Eight Thousand Dollars ($28,000) to Riverkeeper as costs of this litigation and reasonable attorneys' fees. WMC shall pay this amount within thirty (30) days of the Effective Date of this Consent Decree.

## VIII.  RETENTION OF JURISDICTION: TERMINATION OF CONSENT DECREE

The Court shall retain jurisdiction for the purposes of enforcing this Consent Decree and of adjudicating all disputes between the Parties that may arise under this Consent Decree.

## IX.  DISPUTE RESOLUTION

Unless otherwise expressly provided for in this Decree, the dispute resolution procedures of this section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Decree regarding Part V of this Consent Decree. Either Party's failure to seek resolution of a dispute under this section shall preclude the Party from raising any such issue to enforce any obligation of the other Party arising under this Decree.

A.     *Informal Dispute Resolution*. Any dispute subject to Dispute Resolution under this Decree shall first be the subject of informal negotiations between the Parties.  A dispute shall be considered to have arisen when a Party sends the other Party a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed 14 days from service of the Notice of Dispute unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then either Party or both Parties may invoke formal dispute resolution procedures with the Court.

B.     *Formal Dispute Resolution*. Either party may invoke formal dispute resolution procedures with the Court, within the time period provided in the preceding paragraph, by filing a written Statement of Position regarding the matter in dispute.  The initiating party's Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting the filing party's position and any supporting documentation. The other party shall file its Statement of Position within 21 days of its receipt of the initiating Party's Statement of Position.  This party's Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation. The initiating party may, but is not required to, submit a reply within 7 days thereafter.

C.     In invoking formal dispute resolution, the Parties are seeking judicial determination of the dispute.  Except as otherwise provided in the Consent Decree, in any dispute initiated for formal dispute resolution, the initiating party shall bear the burden of demonstrating that its position is correct and complies with this Decree. The Court shall determine, in its discretion, whether to hold a hearing to take testimony from witnesses on any issue or whether to resolve the dispute on the papers, including any declarations, submitted.  The Court may also elect to refer any dispute to a magistrate judge for determination by hearing or on the papers through a report and recommendation.

D.     The invocation of dispute resolution procedures under this section shall not, by itself, extend, postpone, or affect in any way any obligation of WMC under this Consent Decree, unless and until final resolution of the dispute so provides.

## X.     SEVERABILITY

The provisions of this Consent Decree shall be severable.  If any provisions are declared by a court of competent jurisdiction to be unenforceable, the remaining provisions shall nevertheless remain in full force and effect.

## XI.    LODGING AND APPROVAL OF DECREE

Pursuant to § 505(b)(3) of the CWA, 33 U.S.C. § 1365(b)(3), this Consent Decree will be lodged with the Court and simultaneously presented to the United States for its review for a period of forty-five (45) days. After the statutory period

expires, this Consent Decree will be entered by the Court as a final judgment of the Court. If this Consent Decree is not entered by the Court, the Parties shall retain all rights they had in this litigation before lodging of this Consent Decree. In the event the United States proposes modifications to this Consent Decree, the Parties agree to confer and undertake good faith efforts to resolve any disputes that may arise out of the proposed modifications by the United States of the Consent Decree.

## XII.  TERMINATION

The parties to this Consent Decree and Settlement Agreement may terminate this Agreement upon written mutual agreement. The Settlement Agreement will terminate upon final closure of Slurry Impoundment No. 14, to include draining the impoundment and capping it, and eliminating the use of Outfall 042 at WMC's Mine No. 7 in accordance with applicable state and federal regulations; provided, however, that certain requirements set forth herein may expire earlier per the terms of this Agreement.

## XIII. COMMUNICATIONS

A. Except as otherwise specified, when Riverkeeper or WMC transmits any written notification or communication required by or in conjunction with the terms of this Consent Decree, the notification shall be addressed as follows both to the stated physical address and the email address of counsel as follows:

<u>As to Riverkeeper</u>:

Eva Dillard, Staff Attorney
Black Warrior Riverkeeper, Inc.
712 37th Street South
Birmingham, Alabama 35222-3206
edillard@blackwarriorriver.org

<u>As to WMC</u>:
Thomas L. Casey, III
Jason B. Tompkins
Sloane Bell Phillips
1901 6th Avenue N # 1500
Birmingham, AL 35203
tcasey@balch.com
jtompkins@balch.com
sphillips@balch.com

B.  WMC and Riverkeeper agree to accept service by U.S. Mail and email with respect to all matters arising under or relating to this Consent Decree and to waive any formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court.

C.  The Parties shall immediately notify one another of any change of address, whether of physical or email address.

## XIV. SIGNATORIES

The undersigned representatives of the Parties certify that they are fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind such party to this document.

This Consent Decree may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

The parties having allocated the award of costs herein, unless specifically directed herein, all costs are taxed as paid.

**DONE** and **ORDERED** on September 18, 2024.

_____
L. Scott Coogler
United States District Judge

220685